Sigifredo GONZALES, Appellant,

v.

The STATE of Texas, Appellee.

No. 53890.

Court of Criminal Appeals of Texas,
Panel No. 1.

Sept. 17, 1980.

Dan W. Heard, Port Lavaca, for appellant.

Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and PHILLIPS and CLINTON, JJ.

OPINION

CLINTON, Judge.

Appeal follows conviction for the felony offense of possession of marihuana wherein the trial court assessed punishment at confinement in the Texas Department of Corrections for ten years and a fine of five thousand dollars.

Though appellant advances some seven grounds of error for our consideration, we need not reach each of these contentions. In ground of error number three, complaint is made that the appellant was denied the effective assistance of counsel at trial for the reason that trial counsel's multiple representation of appellant and two other co-defendants created an actual conflict of interest thereby impairing trial counsel's effectiveness. We agree and reverse the judgment below.

This cause has had a somewhat checkered procedural history. Confronted with the jurisdictional issue of whether appellant waived the time in which to file a motion for new trial or a motion in arrest of judgment prior to being sentenced, the Court dismissed the instant appeal in an unpublished opinion on December 15, 1976. Resubmitted for consideration on February 7,

1978 on briefs[1] and oral argument, this cause was again remanded albeit for different reasons which, as it turns out, form the basis for reversal of this judgment. After reviewing the facts adduced at trial, the majority of the panel pointed out that the record before the panel was silent as to whether appellant had ever been warned by his trial counsel of the risks inherent in multiple representation by sole attorney in a criminal proceeding. Accordingly, over the dissent of one judge, the panel ordered the instant appeal held in abeyance until the trial court could hold a prompt evidentiary hearing limited to the issue of "what disclosure or warnings, if any, were given to appellant concerning the dangers of his attorney also representing his codefendants," and similarly ordered the trial court to prepare findings of fact and conclusions of law in this regard.

Less than a month after the panel opinion of April 25, 1979, commendably the trial court held the evidentiary hearing, made and filed findings and conclusions, and caused the record to come to the Court.

Appellant testified that *at no time* during the course of the proceedings did his attorney apprise him of the dangers of joint representation or the possible conflict of interest[2] that would attend such representation. There were other witnesses and their testimony will be mentioned as appropriate. The nub of the problem before us is that, in presenting a defense to the charge of joint possession of a large quantity of marihuana by each accused, trial counsel put one of them on the witness stand and, as will be detailed *post*, elicited testimony that inculpated appellant as well as the third codefendant.

It is undisputed that during the course of arraigning the three accused, the trial court did inquire of appellant as to his satisfaction with their retained counsel. However, appellant insists that he was not admonished as to the dangers of multiple representation or of possible conflict of interest and, also, that he was never counselled by his attorney on either point. There was other testimony to the same effect. After the ordered evidentiary hearing the court below made a single factual finding as follows:

"Insufficient and inadequate warnings and disclosure were given to Sigifredo Gonzales concerning the dangers of his attorney, Regis Toomey, also representing Floyd Phillips and Cenovio Trevino, two of his co–defendants in the trial of this case on its merits."

The finding is supported amply by the record and will be accepted by this Court as a foundation for our structuring the balance of this opinion.

After the State had rested and the defense had further examined the State's principal witness to the offense, he being one of the four principals, according to his testimony, counsel for the accused moved for an instructed verdict on grounds that the State had not sustained in its burden of proof. During the course of his argument in support of the motion, counsel asserted, "The State's witnesses indicated certainly, against Mr. Gonzales and Mr. Phillips, there was absolutely no possession." Upon the motion being overruled, counsel immediately called to the witness stand Cenovio Trevino, one of the accused.

At the evidentiary hearing appellant testified as to his stated attitude toward Trevino testifying:

Q: Did you object to Mr. Toomey's decision to put Mr. Trevino on the witness stand?

A: *Yes, sir, I did. I was the only one to oppose, to don't let [sic] Trevino take*

---

1. Though not a recognized facet of the jurisprudential vernacular, we really should point out that the instant cause was resubmitted on *brief* and oral argument. For reasons unbeknownst to us, the State has not favored us with a brief though the cause has been submitted on three occasions and has been before this Court for almost four years. We would, at this juncture, direct the State's attention to Article 40.09(10), V.A.C.C.P. in the event of a retrial and appeal.

2. Having been blessed with but a fourth grade education, it is entirely understandable that appellant did not, initially, even comprehend what the term "conflict of interest" means.

*the stand. In fact, Mr. Toomey and I myself, we almost got into a fight.*[3]

Q: Did Mr. Toomey tell you at that time that this is a conflict of interest?

A: *No. Mr. Toomey says that there was no problem, there was no problem.*

Q: So you feel like then you were having to rely on Mr. Toomey to tell you when a conflict of interest might come up that might require you to get some other lawyer?

A: *He never did mention any conflicting interest or any danger about anything. Never did mention it.*

And on cross examination, appellant continued in the same vein:

Q: Okay. When in fact did you believe that there had been a conflict of interest and you should not have been tried along with the other two defendants?[4]

A: *I do believe when I first began to see that something was wrong with the trial was the time that Toomey put Trevino on the stand.*

\* \* \* \* \* \*

Q: Okay. Did you mention this to Mr. Toomey?

A: Yes, sir. We raised a big argument and we almost got into a fight.

Q: Okay. The trial went on anyway?

A: Yes, sir. The trial went on.

Q: Did you ever mention to anybody else that you thought you should have not been tried with the other two defendants while the trial was going on?

A: No, sir. Nobody mentioned to me anything at all.

The conclusions of law reached by the court reads:

**3.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

**4.** When asked if he had ever inquired of Toomey about the possibility of getting a severance, appellant replied that during a lull in the

"CONCLUSIONS OF LAW"

After accepting employment from Sigifredo Gonzales, *Regis Toomey violated his duty to adequately warn Sigifredo Gonzales of the dangers involved in his accepting employment to represent Floyd Phillips and Cenovio Trevino.* I am not of the opinion, however, that anything was done by Mr. Toomey in furtherance of his representation of Cenovio Trevino or Floyd Phillips which was anymore damaging to Sigifredo Gonzales than it was to Cenovio Trevino and Floyd Phillips. *Although a professional responsibility of Regis Toomey was violated,* I do not find that this resulted in a denial to Sigifredo Gonzales of effective assistance of counsel.

▮ We are in total agreement with the finding of the court that insufficient warnings about the dangers inherent in multiple representation were given to appellant. Moreover, we similarly concur in that portion of the conclusion of law holding that Toomey violated a professional responsibility by failing to apprise appellant of the dangers of multiple representation and the conflict of interest of which Toomey either knew or should have known. We are, however, constrained to disagree with the conclusion that this breach of a legal and professional duty by the trial attorney did not result in a denial of the effective assistance of counsel to appellant merely because the latter was not harmed anymore than his codefendants. Without the benefit of the recent Supreme Court holding in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), a case not decided until well over a year after the evidentiary hearing, we appreciate that the court below could hardly anticipate its holding that where an accused demonstrates that an actual conflict of interest adversely impairs his trial lawyer's performance, the accused

proceedings on May 10th, he asked Toomey, "Why don't you leave me out [of this trial]." Phillips overheard the exchange. Appellant expressed his desire for a separate trial, but Toomey replied that "the Judge would not permit it" so it was futile to ask for one.

need not demonstrate "actual prejudice" because harm is presumed.

To fully understand this rationale, it is necessary to review *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and its progeny, which, in turn, bear out our conclusion in this case.

*Glasser* involved multiple representation by one attorney of a pair of former assistant United States attorneys who were charged with entering into a conspiracy to defraud the United States by accepting bribes to corrupt and influence enforcement of the federal liquor laws. Defendant Glasser contended that because of this dual representation his counsel not only declined to cross examine a witness adverse to him in order to protect counsel's other client, but also failed to object to hearsay testimony for fear it would leave the jury with the impression that the testimony was true as to the other codefendant. The Supreme Court found that this joint representation deprived Glasser of the effective assistance of counsel even without the demonstration of any specific prejudice flowing from the dual representation:

". . . [T]he assistance of counsel guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. *If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired . . .*

"There is yet another consideration. Glasser wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected. *Irrespective of any conflict of interest the additional burden of representing another party may conceivably impair counsel's effectiveness.*

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. *The right to have the assistance of counsel is too fundamental and absolute to allow court to indulge in nice calculations as to the amount of prejudice arising from its denial."* 315 U.S. at 70, 75–76, 62 S.Ct. at 465, 467, 86 L.Ed. at 699, 702.

That counsel has a legal duty to refuse employment by clients with conflicting interests unless a full and prompt disclosure is made to them is not only well settled but codified in the Texas Code of Professional Responsibility, DR 5–105:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

"(C) In the situation covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and *if each consents to the representation after full disclosure of the possible affect of such representation on the exercise of his independent professional judgment on behalf of each."*

See also ABA STANDARDS RELATING TO THE DEFENSE FUNCTION, § 3.5.

Consistent with the dictates of our Code of Professional Responsibility, and perhaps because of them, this Court has repeatedly held that trial counsel has the primary responsibility for advising the prospective clients of possible conflicts of interests in their positions where multiple representation is concerned. See *Pete v. State,* 533 S.W.2d 808, 809–810 (Tex.Cr.App.1976) where Judge Odom pointed out:

"At the outset of the trial it was retained counsel, not the trial court, who was under the duty to investigate and determine any possible conflict between his clients.

The trial court could only have been aware of the general possibility of conflict of interest that exists whenever there are multiple defendants. This possibility, although always real, is not inevitable.

"Furthermore, we are aware of no statutory or other authority in this jurisdiction that would require a trial judge, upon the mere appearance of conflict among the positions of multiple defendants who retained one attorney, to halt the proceedings and take the action urged by appellant."

In *Cuyler v. Sullivan*, supra, the Supreme Court echoed these sentiments under the facts of that case noting that the Sixth Amendment imposed upon the trial court, absent an objection from trial counsel regarding any conflict of interest, no affirmative duty to inquire into the propriety of multiple representation. *Id.* 446 U.S. at 348, 100 S.Ct. at 1718. See and compare *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

 It follows, then, that where, as here, trial counsel compounds the breach of a legal and professional duty by failing to voice an objection to potentially conflicting interests vis a vis his several clients, his unwitting client has not established the constitutional predicate for his claim of ineffective assistance of counsel unless and until he can demonstrate that his counsel has represented actually conflicting interests which in turn adversely affected his lawyer's performance. *Cuyler v. Sullivan*, supra, 446 U.S. at 348–350, 100 S.Ct. at 1718–1719.

Returning to the jurisprudence of this State, we have only recently held that an actual and significant conflict of interest of the degree requiring reversal exists when "one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co–defendant whom counsel is also representing." *Ex parte Alaniz*, 583 S.W.2d 380, 381 at n. 3 (Tex.Cr.App.1979) quoting *Foxworth v. Wainwright*, 516 F.2d 1072 at 1076 (5th Cir. 1975). See also *United States v. Huntley*, 535 F.2d 1400 (5 Cir. 1976).

When judged by this standard, it cannot be seriously disputed that trial counsel in the instant case was struggling to serve no less than *three* masters, each of whom was entitled to the undivided loyalty of counsel in preparing their respective defenses. Nowhere is this actual conflict more apparent than in the eventual decision by trial counsel to call Trevino, conceded to the trial court to be most culpable,[5] a sober fact readily discerned in the panel opinion remanding this cause for the evidentiary hearing:

"In the course of the direct examination of Trevino, considerable evidence detrimental to appellant was elicited. Trevino testified that after he rented the plane, he flew to a small airstrip, where he was met by appellant. The men removed the rear seat from the plane and placed it in appellant's car. When asked if appellant knew 'what you were doing essentially down in McAllen,' Trevino replied that 'He [appellant] had a pretty good idea.' Trevino further related that he placed a series of calls to appellant and his wife arranging to have appellant meet him at various airports in an effort to pick up a load of marihuana. Trevino testified that while they were at the Bay City Airport discussing what to do that he and appellant did all the talking."

We have no trouble perceiving how Trevino "could have [stood] to gain significantly" by taking the stand and advancing "plausible arguments and adducing probative evidence that were damaging to the cause of a co–defendant." *Ex parte Alaniz*, supra, at 381, n. 3. What began as a foreseeable conflict of interest became an actual conflict of interest as far as appellant is concerned as he was impelled to sit mute while Trevino painted an extremely damag-

---

5. Why trial counsel used Trevino as the vehicle for getting a defensive version of events before the jury is a mystery not yet solved, for at the evidentiary hearing below trial counsel was never asked and he did not volunteer.

ing portrait of his involvement in this offense—filling in the gaps left by the State on the canvas.

Presenting Trevino but not appellant or Phillips to the jury also created the framework for a situation somewhat akin to *De Luna v. United States*, 308 F.2d 140 (5 Cir. 1962). There two codefendants retained separate counsel to defend against a federal narcotics prosecution; during the trial his codefendant took to the stand but De Luna did not. The attorney for one Gomez, the testifying codefendant, in arguing for his client before the jury, commented on the failure of De Luna to testify—something, of course, that is forbidden to the Government by the Fifth Amendment, but not to the commenting attorney for a codefendant.[6]

When Trevino was called to be a witness in the instant case, in the presence of the jury the trial court admonished him, in part:

"Let me tell you this. You are the Defendant in this case. . . . And the Court will again warn you that you cannot be compelled to testify. If you testify, you must do so of your own free will and accord, even as against your attorney advising it. * * * *"

After providing some personal background data and identifying himself as an accused in the case on trial, Trevino answered certain questions put to him by his attorney, as follows:

"Q: And now you have discussed the aspects of testifying in your own behalf with me, have you not?

A: Yes, sir, I have.

Q: And I have discussed all aspects of the law involved in testifying, have I not?

A: Yes, sir.

Q: To your satisfaction?

A: Yes, sir.

Q: And *you chose to testify* at this time?

A: Yes, sir."

Trevino then gave what his attorney charitably characterized as "a different story" from the scenario crafted by witnesses for the State, particularly the fourth actor.[7] His attorney passed Trevino for cross examination near the end of the trial day, and the trial court began to inquire of the jurors whether staying a little longer would be an imposition. Defense counsel interjected:

"Your Honor, I would be happy to tell you that *I am not going to call anyone else to testify*, if that is going to have any bearing on your decision today. *I don't anticipate calling anyone else* after Mr. Trevino."

Cross examination then proceeded. Redirect concluded with counsel establishing that Trevino had never been convicted of a felony.[8] The accused rested and both sides closed. We have not been favored with a transcription of the notes taken by the court reporter during argument to the jury.[9]

*De Luna* teaches:

---

6. "Gomez has rights as well as De Luna, and they should be no less than if he were prosecuted singly. His right to confrontation allows him to invoke every inference from De Luna's absence from the stand." *De Luna*, supra, at 143.

7. The details need not be compared. Suffice to say Trevino told an internally incredible tale to extricate himself that further implicated appellant. His conviction became final after the Court affirmed it on an appeal that did not question sufficiency of evidence or major error during trial; the unpublished per curiam opinion, *Trevino v. State*, No. 54,671, delivered June 7, 1978, is noted at 565 S.W.2d 951 (Tex.Cr. App.).

8. During the punishment phase before the trial court without a jury the State established that Phillips had been previously convicted of felony possession of marihuana and was still on five years probation; appellant testified that in 1975 he had been convicted of the federal felony offense of conspiracy to possess marihuana, but had been told by his attorney in that case that it had been "dismissed" on appeal, without any further substantiation.

9. Though we do not know what counsel for appellant said in his argument to the jury, it is difficult to imagine how he could avoid remarking on testimony given by Trevino and thereby implicitly alluding to what he had already made obvious to the jury—that appellant chose not

". . . [A]n accused has a constitutionally guaranteed right of silence free from prejudicial comments, even when they come only from a co–defendant's attorney. If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co–defendant's silence, the trial judge's duty is to order that the defendants be tried separately."

Metaphorically, Judge Wisdom wrote for the court:[10]

"Thus, the joint trial of the two defendants put Justice to the task of simultaneously facing in opposite directions. And Justice is not Janus–faced."

*Id.* at 143.

And, after a lengthy discussion of the law, concluded:

"In short, for each of the defendants to see the face of Justice they must be tried separately."

*Id.* at 155.

We are not concerned with a severance issue, but what we do learn from this is that appellant's trial attorney assumed a Janus–like role and attempted to face in opposite directions. See also *Porter v. United States*, 298 F.2d 461 (5 Cir. 1962).[11] Undivided loyalty to one's client required of a criminal defense attorney dooms the performance.

Having been denied effective assistance of counsel during the course of his first trial, appellant is entitled to be represented at a second one by a criminal defense lawyer who is "[un]fettered or restrained by commitments to others," *Porter v. United States*, supra, at 463.

The judgment of conviction is reversed and the cause remanded.[12]

---

to testify. Be that as it may, we look to the lesson of *De Luna*, supra, not its literal application.

10. Judge Griffin Bell concurred because in his view De Luna had not been accorded a fair trial under the Sixth Amendment. He did not agree that Gomez had the right to comment, and when it was first made corrective action should have been taken to insure a fair trial to De Luna.

11. Speaking of a conflict of interest on the part of trial counsel that was not revealed before trial, the court opined:

". . . [W]e are certain the careful Judge below would have [taken corrective action] had the facts been known at or before the commencement of the criminal trial. But where this has been allowed to occur, either through a calloused conscience of the attorney, or ignorance of the true facts by the Judge, the trial is not the fair one demanded by the Constitution. And this is so without regard to the presence or absence of any action of a strictly governmental nature which can be ascribed to the prosecution as the transgressing agency or imputed to the trial court on traditional notions of error on the Judge's part."

12. Nothing stated, found or concluded in this case is intended to suggest applicability to the plight of Phillips, the third codefendant, for we do not know his present status; accordingly, we intimate no view concerning him.